**In re ERIE HILTON JOINT VENTURE, a Pennsylvania Limited Partnership doing business as the Quality Hotel Plaza, Debtor.**

**OFFICIAL UNSECURED CREDITORS' COMMITTEE OF ERIE HILTON JOINT VENTURE, Plaintiff,**

**v.**

**William SISKIND, Consolidated Management, Inc., Leon Levitsky, Henry Fensterwald, Arvin E. Rosen, Herman Rubin, Bernice Hutzler, and Maurice Wyatt, Defendants.**

**Bankruptcy No. 89–00571E.**
**Adv. No. 91–0091.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Sept. 23, 1992.

Lawrence C. Bolla, Erie, Pa., for Official Unsecured Creditors' Committee.

John Martin Klein, Baltimore, Md., and Guy C. Fustine, Erie, Pa., for Herman Rubin.

Gary V. Skiba, Erie, Pa., for William Siskind and Consolidated Management, Inc.

Charles D. Agresti, Erie, Pa., for Arvin S. Rosen, Leon Levitsky and Maurice Wyatt.

James H. Richardson and Harry D. Martin, Erie, Pa., for debtor.

Philip B. Friedman, Erie, Pa., for Bernice Hutzler.

John Martin Klein, Baltimore, Md., for Henry Fensterwald.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

In an Opinion dated March 6, 1992, on Motions to Dismiss the within Complaint to Compel Turnover of Property of the Estate ("Complaint"), we determined that subject matter jurisdiction is proper in this Court; that the Official Unsecured Creditors' Committee ("Committee") has standing to bring the Complaint; and that the Complaint states a claim upon which relief can be granted. *In re Erie Hilton Joint Venture*, 137 B.R. 165 (Bankr. WD Pa.1992). We further stated that "[i]t appears that the Committee would be entitled to Summary Judgment but for the following question of fact—whether the Defendants had knowledge of or agreed to the Confirmed Plan?" *Id.*

Presently before us are multiple Motions for Summary Judgment filed by the Committee and each of the remaining defendants, Arvin Rosen, Leon Levitsky, Maurice Wyatt, Herman Rubin and Consolidated Management, Inc. (collectively the "Defendants").

The Committee asserts that there are no genuine issues of material fact and that it is clear that the Defendants had knowledge of and agreed to the obligation to fund the Erie Hilton Joint Venture's ("Debtor") Second Amended Plan of Reorganization which was confirmed on October 3, 1990 ("Second Amended Plan" or "Confirmed Plan").

Defendants agree that there are no genuine issues of material fact, but assert that the facts show a lack of knowledge or agreement to fund the Confirmed Plan.

Much of the factual and procedural background is discussed in our March 6, 1992 Opinion and need not be repeated here.

Based on the pleadings, depositions, pretrial statements, Motions for Summary Judgment and Briefs and Responses thereto, we find that the Committee has suggested no evidence of any fact which could show an agreement by the Defendants to fund the Confirmed Plan. Accordingly, we will grant each of the Defendant's Motions for Summary Judgment and deny the Plaintiff's Motion for Summary Judgment. The Complaint will be dismissed.

### Discussion

On April 26, 1990, the Debtor filed its original Plan of Reorganization. An Amended Plan of Reorganization ("First Amended Plan") was filed on June 1, 1990. Both plans contemplated an infusion of capital to renovate and continue operation

of the Debtor's single asset, the Quality Hotel Plaza ("Hotel"). Debtor's counsel, Harry D. Martin, Esq. ("Martin") felt it necessary to have a sum of money in escrow to convince the Court and the Debtor's major secured creditor, the Prudential Insurance Company of America ("Prudential"), of the feasibility of the First Amended Plan. In response to Martin's request, Defendant Rubin prepared a list of proposed amounts of contribution by the various Defendants and began soliciting such contributions. Rubin proposed contributions as follows:

| | |
|---|---|
| Rubin | $350,000 |
| Levitsky | 350,000 |
| Siskind | 134,597 |
| Wyatt | 107,937 |
| Rosen | 52,727 |
| Fensterwald | 29,953 |
| | $1,025,214 |

Rubin advised Siskind and Rosen that he had met with Prudential on May 10, 1990; that he was to meet again with Prudential on May 22, 1990; and that Prudential wanted the contributions of $1,025,214 placed in escrow before May 22, 1990.

Rubin contemplated that he and Levitsky would take over the operation and management of the Hotel but structure the transaction in a manner that the tax attributes of the limited partnership could be maintained. Thus, it was contemplated that the bulk of the contributions would be provided by Rubin and Levitsky with the other limited partners contributing smaller amounts to preserve their tax benefits.

In response to Rubin's call for contributions, Martin, as escrow agent, received $350,000 from Levitsky; $50,000 from Wyatt; and $52,727 from Rosen. Rosen's contribution was accompanied by a letter dated May 18, 1990 which stated, in part:

> [t]his amount is being delivered to you in trust and is contingent upon (i) all parties contributing their respective shares as set forth below; and (ii) the plan of reorganization being adopted by the bankruptcy court in Case No. 89–571E. In the event either of these contingencies does not occur, I expect you to return this full amount to the undersigned.

Limited Partners Contributions:

| | |
|---|---|
| Rubin | $350,000 |
| Levitsky | 350,000 |
| Siskind | 134,597 |
| Wyatt | 107,937 |
| Rosen | 52,727 |
| Fensterwald | 29,953 |
| Total | $1,025,214 |

Based on Rubin's proposed list of contributions, the Debtor prepared and filed a Combined Summary of Plan of Reorganization which states in part:

> A Plan has been proposed on behalf of Hilton by a New Corporation which would be funded with one million dollars. The New Corporation is owned 60% by Herman Rubin and 40% by Leon Levitsky. The million dollars is being provided by the following individuals:

| | |
|---|---|
| Herman Rubin | $352,168 |
| Leon Levitsky | 352,168 |
| Consolidated Management, Inc. | 135,000 |
| Arvin E. Rosen | 52,727 |
| Maurice Wyatt | 107,937 |
| | $1,000,000 |

Martin never had any contact concerning the contributions with Levitsky, Wyatt or Fensterwald. Martin knew as of May 18, 1990 that Consolidated Management, Inc., through its President, William Siskind, was not going to contribute and also learned at some point that Fensterwald would not contribute. Rubin, the catalyst behind this plan, failed to place his contribution in escrow, although Martin was convinced that Rubin had the money available in liquid funds and would contribute when necessary.

Martin understood that he held the funds in escrow without authority to disburse the funds. The only authority Martin had was to make representations to the Court that he had the monies. Despite representations to the Court and Prudential that the Debtor had $1,000,000 available (without advising the Court and Prudential of any qualifications on the monies held in escrow), Prudential continued to oppose the First Amended Plan.

Rather than continue the battle with Prudential, a Second Amended Plan was devised which did not involve continued oper-

ation of the Hotel. Instead, there was an agreement whereby Prudential was given control of the Hotel, while the limited partners would retain the tax benefits by accomplishing a tax-free exchange under § 1031 of the Internal Revenue Code. Martin had conversations with Siskind, Rubin and Rosen with regard to the Second Amended Plan but none of those discussions involved funding.

The Debtor filed its Second Amended Plan on August 23, 1990. On August 31, 1990, we entered an Order which required the Debtor to file a Third Amended Disclosure Statement and to follow the same procedure for confirmation of this new Plan as it had followed in the first. On September 4, 1990, the Debtor requested an immediate status conference to deal with timing problems caused by our August 31, 1990 Order due to the sheriff's sale of the Hotel scheduled by Prudential. On September 5, 1990, a status conference was held at which Debtor's counsel advised the Court of the urgency to have the Second Amended Plan confirmed prior to the sheriff's sale in order to qualify for the tax free § 1031 exchange; that the Second Amended Plan was substantially the same as the prior plan; and that confirmation should proceed without further voting.

On the same date, September 5, 1990, the Debtor filed a Combined Summary of Seconded [sic] Amended Plan for Reorganization and Disclosure Statement (the "Second Combined Summary") which contained similar language to the original Combined Summary regarding funding of the plan:

> A Plan has been proposed on behalf of [Debtor] by a New Corporation which would be funded with cash for all sums required by this Plan. The New Corporation is owned 60% by Herman Rubin and 40% by Leon Levitsky. The cash is provided by the following individuals: Herman Rubin, Leon Levitsky, Consolidated Management, Inc., Arvin E. Rosen, Maurice Wyatt.

The language regarding funding contained in the Second Combined Summary was included in error. Contributions to the funding of a "new corporation" was not a part of the Second Amended Plan. The "new corporation" was contemplated as part of the process of renovation and continued operation of the Hotel under the First Amended Plan but had no place in the exchange transaction. The Committee's reliance on the language of the Second Combined Summary to bind the Defendants to contribute was misplaced—this language was promulgated in error by the Debtor—not the Defendants.

At the confirmation hearing held on October 3, 1990, the Court inquired into the tax benefits to the limited partners and the mechanics of the § 1031 exchange. In colloquy with Don Reynolds, Esq., the Debtor's tax consultant on the § 1031 exchange, it was made clear that each limited partner would have to determine later if and in what amount the limited partner would contribute to the Second Amended Plan:

> THE COURT: Then you have the risk that somewhere along the line you might not get through one of your hoops.
>
> MR. REYNOLDS: Absolutely. We sit here today—this is, I said, the first vital first step. But certainly only the first step of identifying a replacement property, identifying a replacement property that qualifies like kind for this property. And acquiring it in a manner that satisfies the regulations under Section 1031 of the Internal Revenue Code.
>
> THE COURT: I suppose what that means is partners can't contribute to a plan until the cost outweighs the benefit in view of the risks involved.
>
> Mr. REYNOLDS: Each individual limited partner might have to make that assessment at some point you're describing, yes. That's individual by individual assessment at some point.

Transcript of Hearing at 44, Bankr. No. 89–00571E, Motion No. 90–496, October 3, 1990.

Although Martin felt he had enough funds in escrow to assure that the Second Amended Plan could be implemented, he had no authority to use the escrow fund other than to represent that he had the funds.

As Martin stated in his deposition:

Q. Although there was participation as you understood it in the second amended plan by other limited partners, being specifically Siskind and Rubin, the funding of the plan was to be by only the three from whom you received contributions?

A. No, I didn't say that. I didn't know what the funding of the plan was going to be. The escrow account was there in my understanding, as a manner of assuring the Court and the parties who were being presented with the plan that there was sufficient cash on hand as an assurance that the plan could be implemented. How the parties were going to divide up the actual funding of the plan I didn't know. I wasn't told. All I was concerned about was the representations that I would have to make, and following the instructions that I had from my client that we obtain approval of the plan.

Q. How much money did you need to fund the plan?

A. The second plan?

Q. Yes.

A. I told you, under $400,000.

Q. You had in excess of that in your escrow account.

A. Right. Part of the funds that would implement the plan would be any remainder of money that would be available as I understood it from the Joint Venture. I understood the parties were trying to operate the Joint Venture in a way that would produce some funds, also.

Q. Would it be fair to conclude some of the funds that you had in escrow would have been refunded to those who had contributed to you?

A. Perhaps, maybe all of it.

Q. If all of it would have been refunded from what source would the funds have come?

A. I don't know. Once the plan would been funded the reason for the escrow account would have dissipated.

Deposition of Harry D. Martin, Esq. at 28–29, June 2, 1992.

As far as Consolidated Management, Inc. general partner is concerned, and its President William Siskind, there is also no evidence of any agreement to fund the Confirmed Plan. In fact, as Martin states in his deposition:

Some of them I knew, like, even as of May 18, 1990, it was my understanding that Siskind was not going to come up with $134,000.

Deposition of Harry D. Martin, Esq. at 12, June 2, 1992.

While it was understood by the Committee, based upon the comments of Debtor's counsel, that the same parties who were willing to fund the previous plans were also willing to fund the Confirmed Plan, it is clear that there was never any agreement as to who would fund the Confirmed Plan and the amount of such funding. It is also clear that the funds held in escrow were not for the purpose of funding the Confirmed Plan, but were there merely to assure the Court and Prudential that a Plan could be funded—but there was absolutely no agreement on who would fund the Plan and in what amounts.

Under Pennsylvania law, 15 Pa.C.S.A. § 8542, "[a] promise by a limited partner to contribute to the limited partnership is not enforceable unless set out in a writing signed by the limited partner."

Here, there is no agreement or promise. The only writings signed by any of the Defendants are the ballots cast accepting the First Amended Plan. There were no ballots cast for the Confirmed Plan. The Committee asserts that under 11 U.S.C. § 1127(d), when the First Amended Plan was modified without further re-balloting and the Defendants made no objection nor changed their previous acceptance, that the Defendants "accepted" the Confirmed Plan.

None of the Defendants were served a copy of the Second Combined Summary until after confirmation. We cannot hold the Defendants' failure to appeal the confirmation order as an agreement to fund the Confirmed Plan. Statements concerning funding in the Second Combined Summary are statements of the Debtor—not of the proposed contributors.

Following confirmation, Martin contacted certain of the Defendants to ascertain the

status of securing an exchange property and the funding of the Confirmed Plan. Thus, it is obvious that Martin knew the monies in escrow were not to be used to fund the Plan and that the partners had yet to come to agreement on who was to fund the Plan and in what amounts.

### Summary

Rather than proceed as the Court had suggested in its Order of August 31, 1990, with the filing of a Third Amended Plan and providing notice to all creditors and equity security holders, the Debtor rushed to confirm the Second Amended Plan without having previously determined the location and cost of the exchange property, and without a firm commitment of one or more individuals to acquire an exchange property and fund the Plan.

Plaintiff's proposed evidence discloses an absence of affirmative evidence that the Defendants agreed to fund the Confirmed Plan. There is ample evidence to show the lack of any such agreement.

Future circumstances were to dictate the level of contributions, if any, by the Defendants. In the absence of any funding commitments, the Confirmed Plan has collapsed.

### ORDER

This 23rd day of September, 1992, in accordance with the accompanying OPINION, it shall be, and hereby is ORDERED that the Motions for Summary Judgment filed by each of the remaining Defendants is GRANTED; that the Official Unsecured Creditors' Committee's Motion for Summary Judgment is REFUSED; and that the Official Unsecured Creditors' Committee's Complaint is DISMISSED.